UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROL BENZ,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>THE CLOROX COMPANY,<br><br>　　　　Defendant. | Case No. 13-cv-01361-WHO<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 37, 56 |

In this age discrimination and unlawful termination case, plaintiff Carol Benz fails to raise a material issue of fact on whether the reasons given for her termination were pretext for age discrimination or that her termination violated an implied-in-fact contract not to discharge but for cause. After hearing oral argument on March 19, 2014, and considering the record, I GRANT defendant's motion for summary judgment.

## BACKGROUND

Carol Benz was hired by Clorox in 2002, at the age of 52. Declaration of Carol Benz, ¶ 5. She started as an Associate Shopper Insights Manager (grade 26) and progressed to a Shopper Insights Manager ("SIM," grade 27) by 2004. *Id*. Benz worked as a SIM on various teams and in various locations, and in April 2007 became a Category Shopper Insights Manager for the Cleaning Division, based in Oakland, California. *Id*. ¶ 9.

Under Clorox's employee review procedure, employees are reviewed over the course of the fiscal year. The review process ("PMP") consists of: developing a plan with a manager; feedback, coaching and mid-year reviews; and then a manager assessment and "focal point review" where the employee's performance is "calibrated" against others in the organization. *See* Exhibit 7 to the Deposition of Marcelle Bolding CLX 0794, 0801. As the end of the process, the employee receives a PMP Performance Plan and Review document which gives the employee an

1  overall color rating, as well as separate color ratings for each of the employee's major
2  responsibilities and objectives. *See, e.g.,* CLX 0531-0536. As part of this process, managers
3  solicit feedback from internal and external "business partners" who the employee works with.
4  *See, e.g.,* Bolding Depo., Ex. 7 at CLX 0797. Employee performance at Clorox is measured by
5  how well employees do against expectations and against how others are doing. *Id*. at CLX 0809.
6  The guidelines for the color rankings are: the top 10 percent receive gold; the next 70 percent
7  receive green; the next 15 percent receive yellow; and the bottom 5 percent receive red. *Id*. at
8  CLX 0809. Testimony confirms that yellow signals poor performance and that red is rarely used.
9  Deposition of Rajakanthan Rajaratnam at 69:3-10. Clorox also uses a "P2 grid" to rank
10 employees "low to high" for performance and "low to high" for potential to move to higher grade
11 levels. Bolding Depo., Ex. 7 at CLX 0801. These grids are not shared with the employee. Clorox
12 also has a formal "360-degree" feedback process where managers solicit feedback on employees
13 from clients and coworkers for development purposes. Bolding Depo., Ex. 7 at CLX 0797.
14     Benz's performance ratings over time are quite relevant in this case. For FY2007, Benz
15 was rated a "low" on both performance and potential on her P2 grid. Bolding Depo., Ex. 17.
16     For her FY 2008 review (covering July 2007 through June 2008), Benz received an overall
17 yellow rating on her PMP. Benz Decl., ¶ 11. She also received yellow ratings for: Leadership &
18 Influence; People Development; Analytical & Decision-Making; and Adaptation & Flexibility. *Id*.
19 ¶ 14. Benz ascribes her yellow ratings to the fact that she was overwhelmed and overworked in a
20 new position, some of her "business partners" felt "neglected," and she was not sufficiently
21 executing her responsibilities. Benz Decl., ¶ 11. Benz was "admonished" to take a stronger
22 leadership role and to improve her communication skills. *Id*. Benz was also rated low on
23 Clorox's P2 grid for both performance and potential. Bolding Depo., Ex. 17.
24     For her FY2009 review, under her manager Chad Marston, she received an overall Green
25 rating. CLX 0543. She was rated yellow on Communication, but gold on Motivation &
26 Commitment and Functional & Technical Knowledge. CLX 0543. The review noted that she had
27 switched positions mid-year, to assume a newly created Shopper Insights Center of Excellence
28 (COE) position and had made huge strides and had been asked to participate in company projects

1  by senior management. CLX 0543; Benz Decl., ¶ 13. Her communication had improved steadily,
2  and her written presentations had moved from data collection and delivery to a cleaner more
3  effective form. Her verbal communication had improved, but there was room for more growth.
4  CLX 0543. Her knowledge was "undeniable," but her ideas were not "conveyed as clearly when
5  she presents," although that was improving. CLX 0544. In 2009, Benz received a high on the P2
6  grid for performance and a low for potential. Bolding Depo., Ex. 17.
7        In late 2009, the COE role was eliminated and Benz became the dedicated Shopper
8  Insights Manager for Target, Dollar General and Family Dollar. Benz Decl., ¶ 17. For her
9  FY2010 review, under her manager Suzanne Cheves, she received an overall Green rating. CLX
10  0535. The report noted that her peers wanted to see and hear more from her, and that while she
11  had "made progress in the area of communication, she still needs to get to the point faster and
12  more clearly to keep her audience with her." CLX 0531. Chris Warren (of the Dollar General
13  team) "noted a dramatic improvement in her customer facing skills vs. in the past." CLX 0532.
14  She was rated as a green-minus in Leadership & Influence, Interpersonal Relations and
15  Communication; a green-plus in Adaptation & Flexibility; and gold in Analytic & Decision-
16  Making, Motivation & Commitment and Functional & Technical Knowledge. CLX 0535. Benz
17  was identified as having made improvements in her communication skills, but to get to the "next
18  level" was advised she needed to simplify and streamline her written and verbal communications
19  and "not lose her audience." She was commended for the high confidence her business partners
20  had in her, and advised that to get to the next level she needed to increase the visibility of her work
21  and thought leadership. *Id.* Benz was also rated a high on performance in her P2 grid, but a low
22  on potential. Bolding Depo., Ex. 17.
23        On her FY2011 PMP review, under Brian Hoffstedder who became Benz's manager in
24  November 2010, Benz received an overall green rating. CLX 0526-0530. The PMP noted that in
25  July 2010 Benz was nominated by Chris Warren and Sharon McKnight for a Sales Achievement
26  Award, in light of her performance in COE. CLX 0526; Benz Decl., ¶ 13. She was identified as a
27  green-minus on Leadership & Influence and Communication, but gold on Motivation &
28

United States District Court
Northern District of California

3

Commitment and Functional & Technical Knowledge. CLX 0528.[1] She was commended for her significant contributions to her teams and advised of the "opportunity" in "Communication" which is "essential to continuing to grow as a leader in SI and Clorox." *Id*. She was recognized as the "go-to" person for her technical skills, but was advised that to "drive greater impact" and improve performance she needed to leverage her technical skills "in a leadership capacity" and to identify opportunities and get a "tight" focus on "fewer/bigger/better insight-driven initiatives." *Id*. On her P2 grid, she Benz received a medium on performance and a low on potential. Bolding Depo., Ex. 17.

In FY 2011, Chris Warren (from the Dollar Channel team), provided feedback to Hoffstedder that Benz did a great job on following through on her commitments, a good job at building relationships, and had great organizational skills. Declaration of Chris Warren, Ex. A. However, Warren noted that Benz still had communication issues, specifically that it took her a while to get to the point which was frustrating, and that Benz needed to integrate more into the planning process. *Id*. Warren explained that Benz's communication and thought leadership issues were ones he noticed when he worked with her in 2007, and that she continued to struggle with them in 2011. Warren Decl., ¶¶ 4, 5, 7. Warren believed that Benz did not have the skills to perform as a grade 27 insights manager. *Id*. ¶ 7.

In November 2011, Hoffstedder recapped his IDP and Career discussion with Benz, noting that Benz needed to drive more "specifics into action" so they could "measure progress in Leadership, Influence, and communication between now and interim reviews," and should focus on plan development, streamlined priorities and generating deliverables. CLX 0594.[2]  In

---

[1] Hoffstedder testified that a "green-minus" was "less than satisfactory" and "trending towards yellow." Hoffstedder Depo. at 188:1-3; 188:21 – 189: 20. Rajaratnam testified that Benz's FY2011 PMP overall was a green-minus, meaning "on the lower side of the greens." Rajaratnam Depo. at 76:5-11. He explained that while HR allows pluses or minuses in the skill ratings, they did not allow pluses or minuses in the "summary" overall rating. *Id*. at 76:22-25.

[2] Benz testifies that she believed that Hoffstedder supported her initiative to attain a grade 28 position. Benz Decl., ¶ 22. Hoffstedder testified that as part of the IDP process he gave Benz "very specific feedback on what she needed to do to perform at a high level and ultimately be considered for Grade Level 28. Over the course of the next few months, we did not see any measurable growth in the areas that we outlined." Hoffstedder Depo. at 165:5-11. Benz's manager Tamara House testified that Benz "was very adamant about getting to the next level, but in order to have those conversations we needed to have her performing at another – you know, a

December 2011, Vikram Sarma became the Director of Shopper Insights, the group where Benz worked. Benz Decl., ¶ 24. In January 2012, Hoffstedder was replaced by Tamara House as Benz's manager. *Id*.

In FY2012, Benz remained the SIM for the Target, Family Dollar and Dollar General teams. Benz was rated an overall yellow at her interim FY2012 calibration, which was completed on January 24, 2012. Declaration of Rajakanthan Rajaratnam ¶ 11. In February 2012, House and Hoffstedder gave Carol her mid-year review. CLX 0002. In that review, key skill gaps were identified and her 360 feedback was reviewed. *Id*. Warren's 360 feedback in 2012 explained that while Benz was enjoyable to work with and the team "loved her," Benz lacked strategic leadership, was not able to lead the team on long-term strategy, and her thought leadership and communication skills were still low. Warren Decl., Ex. B.[3]

In late February 2012, House and Sarma decided to place Benz on an Action Plan and then, if that assessment was not positive, a 60 day PIP. CLX 0013. The Action Plan was put in place on March 1, 2012. CLX 0002. Hoffstedder, who had been Benz's manager from 2010 through early 2012, was not "surprised" that Benz was placed on an Action Plan. Hoffstedder Depo. at 164:21 – 165:3. Hoffstedder had not seen any measurable growth in the areas he identified Benz needed to focus on in November 2011, and that Benz was not meeting the expectations in her current role. *Id*. at 165:5-15, 183:6-12, 184:19-21. Hoffstedder testified that business partner feedback over time confirmed that Benz was not meeting expectations. *Id*. at 184-86. Benz testified that being placed on the Action Plan was "out of the blue" and that while House gave her positive feedback during the plan, Benz felt that House was "simply going through the motions and felt that the decision to terminate me had already been made." Benz Decl., ¶¶ 25, 29.

---

higher level in her current role, and that was communicated." House Depo. at 230:14-19.
[3] Camille Monson and Matt Mizerny from the Target team also provided feedback in 2011 and 2012 to Benz's managers giving Benz low influence and thought leadership marks, expressing their desire to have Benz leverage her insights to how Target works so that plans could be executed, and noting her tendency to over-complicate issues. *See* Declaration of Camille Monson, Exs. A&C; Declaration of Matt Mizerny, Exs. A&B. In order to call into question the testimony of Monson and Mizerny, Benz argues she had "difficulties" with these two co-workers and identified steps she took to address those difficulties. Benz Decl., ¶¶ 19-20.

In May 2012, as part of the 360 feedback review process, Sarma identified feedback from specific coworkers and Target team members about Benz's weaknesses on influence, business engagement, and strategic leadership as well as Benz's need for direction, and her confusing communications and presentations. CLX 0585. On May 16, 2012, Benz was placed on a PIP. CLX 0027-0028. House put her on the PIP because feedback from business partners "indicated that Carol was not showing significant improvement in key skill areas" and that with coaching her "priorities became more focused but ties to business outcomes remained vague." CLX 0002. Under the PIP, Benz needed to make significant improvements in Leadership and Influence, Communication, and Adaptability. CLX 0027-0028.

In a May 23, 2012 email from House to Sarma, House informed Sarma that Benz might not be inclined to sign her PIP, that Benz felt the 360 feedback review was inaccurate, and that the PMP assessment "will be different." CLX 0584. Sarma responded that in "in 2 years we don't see points on the board consistent with her peer group," outlined some of the results her peers had been achieving, and indicated that Benz's PMP would be yellow. *Id*. Sarma also told House that it was "in Carol's best interest to sign. Forget the feedback, results alone not going to stand." In concluding, Sarma told House: "Feel free to have her reach out to me or Raj to get a feeling where her rating will fall. Both of us independently are willing to tell her that results alone won't cut it and then the feedback will corroborate. She will be a yellow. I can't name 1 thing since midpoint that she has achieved commensurate to her peers." *Id*. This email was not shared with HR. Bolding Depo. at 177:15-20.

Benz admits that she "didn't sign" the PIP. She relies heavily on Sarma's email to argue that the PIP was a "sham" and that Sarma had already made up his mind that she would fail the PIP and be terminated. Benz Decl., ¶ 34. According to Benz's own statistical analysis of her "360 feedback" review forms, she believed she averaged overall at 7.4 (out of a maximum of 10) and a rating of 8.4 if Monson and Mizerny's ratings were excluded. *Id*. Benz does not address the fact that her communications and thought influence marks remained low, while her other marks brought her average up.

1    In a May 29, 2012 email from House to Marcelle Bolding in HR,[4] House explained the
2 "key skill" gaps that House had identified as the improvement areas for Benz's PIP. CLX 0005.
3 Sarma testified that Benz's overall rating for her FY2012 PMP was yellow, although Benz never
4 received a final signed PMP for FY2012. Sarma Depo. 241:24-242:5; Benz Decl. ¶ 45. On her P2
5 grid, she received a "low" on both performance and potential. Bolding Decl., Ex. 17.

6    In May and June 2012, during the PIP and following meetings Benz had with the Target
7 and Dollar General client teams, Sarma reached out to check on Benz's performance. With
8 respect to her performance at the Target meeting, Sarma concluded that Benz's assessments of the
9 needs of Clorox with respect to Target were inadequate because they failed to acknowledge short
10 term business objectives and because her only "call to action" was to set up more meetings.
11 Sarma Depo. at 148:4-149:11; 169:20-170:4; 173:19-174:14. With respect to her performance at
12 the Dollar General meeting, the feedback Sarma received was that Benz's presentation had
13 "overwhelmed" the client, that there was good material in there but the client needed "another
14 team" to "figure out what to do with it" as there wasn't a clear call to action, and that Benz needed
15 to communicate more concisely and distill a call to action. *Id*. at 197-200. On July 9, 2012,
16 Sarma received unsolicited feedback from another member of the Dollar General team, noting that
17 Benz was not grasping the scope of the issue (to help create compelling insights and convey them
18 in "no more than a few slides") and that Benz's plan seemed to contain "busy work" lacking in
19 purpose and strategic thought leadership. Ex. 31 to Benz. Depo.

20   In an email to Bolding dated July 3, 2012, House informed Bolding that following "the
21 recent calibration process, Carol's results and skills fell short compared to her peers. Therefore,
22 her termination date will be effective **Monday, July 16**." CLX 0001 (emphasis in original). Benz
23 relies on this email as additional evidence that the PIP was a sham and that the decision to
24 terminate her was made before the end of the PIP period (which was July 16, 2012). According to
25 Bolding, the email reflects House's misunderstanding of the process. As Bolding explained to
26 House and Sarma prior to Benz's termination, just because someone calibrated as a yellow on their

---

[4] Marcelle Bolding was the HR point person for Benz's PIP. She also reviewed the materials from House and Sarma about Benz's performance prior to Benz's termination.

7

PMP did not necessarily mean they would be terminated under the PIP.  Bolding Depo. at 97:20-23, 99:6-10.

On July 10, 2012, Bolding sought advice from a colleague on whether to extend Benz's PIP "given the mixed feedback, the fact that she seems to have a very different perspective on her progress, her tenure and the length of time she was given to show progress," CLX 0005.  On July 11, 2012, House (in emails shared with Sarma and Bolding), conferred with Lauren Koch in HR about the performance feedback House gave Benz during the Action Plan and PIP and the skill gaps that remained.  CLX 0002 – 0004.  They concluded that Monday July 16, 2012 would be Benz's last day.  CLX 0003.  Recognizing the Benz had a different perception than her managers about her performance, Bolding testified that from an HR perspective, Benz's managers had sufficient data to support their perception of Benz's inadequacies and the lack of progress in her skill areas to justify termination.  Bolding Depo. at 163-64.

Benz explains in detail the efforts and accomplishments she believed she made during 2012.  Benz Decl., ¶¶ 36-47.  Clorox contends these efforts were insufficient because they didn't directly correlate to the areas where Benz needed to show marked improvement and did not "drive business" to increase sales of Clorox products.  *See, e.g.*, Sarma Depo. at 148:4-149:11; 169:20-170:4; 173:19-174:14; 197-200; House Depo. at 214:8- 9.  Benz was informed on Friday July 13, 2012, that she was being terminated effective Monday July 16, 2012.  Benz Decl., ¶ 51.

Benz also points to the circumstances surrounding the hiring of her 33 year old replacement, Karen Chen, who was a casual friend of Sarma's from a prior job.  Declaration of Karen Chen, ¶¶ 5-6.  Chen was first interviewed by Clorox for a position with Burt's Bees in February 2012 but did not get that position.  *Id*. ¶¶ 9-10.  She learned from Sarma in April or May 2012 that there might be a position (Benz's position) opening in his group, but that position was contingent upon the performance of Benz.  *Id*. ¶ 11.  In early June 2012, Chen had a telephone interview with Rajaratnam and also spoke with Hoffstedder and another Clorox employee.  *Id*. ¶ 14.  In late June and early July she spoke with Monson, Hollis and Mizerny.  *Id*.  In July, Sarma told Chen she had interviewed well and that if the position opened, it was likely that she would receive an offer.  *Id*. ¶ 15.  On July 25th, Sarma asked Chen to fill out an online application for

8

1  Benz's former position and on July 26th, Chen received the offer to fill that position at Clorox. *Id*.
2  ¶¶ 16-17. Benz contends that Sarma "orchestrated the firing" and made up his mind to fire Benz
3  before the end of her PIP in order to hire Chen.[5]

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate specific facts showing a genuine issue for trial." *Id*. at 324 (quotation marks omitted). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson v.*

---

[5] Benz contends that Chen also had less education and experience than she did, but provides no evidentiary citation or support for that contention. Oppo. at 2:6.

1  *Liberty Lobby, Inc.*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence,
2  and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . .
3  ruling on a motion for summary judgment." *Id*. However, conclusory or speculative testimony in
4  affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill*
5  *Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I. AGE DISCRIMINATION

#### A. Legal Standard

To prevail on her age discrimination claim under the federal Age Discrimination in Employment Act (ADEA), "plaintiff must prove at trial that age was the 'but-for' cause of the employer's adverse action." *Shelley v. Geren*, 666 F.3d 599, 607 (9th Cir. 2012). Under California's Fair Employment and Housing Act (FEHA), plaintiff must prove that age discrimination was "a substantial factor motivating the adverse employment action." *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 225 (2013). Under both her ADEA and FEHA age discrimination claims, at the summary judgment stage plaintiff must make a prima facie case of age discrimination. If she does, the burden shifts to Clorox to articulate a legitimate, non-discriminatory reason for the adverse employment action. If Clorox does, the burden shifts back to plaintiff to "demonstrate that there is a material genuine issue of fact as to whether the employer's purported reason is pretext for age discrimination." *Shelley v. Geren*, 666 F.3d at 608 (applying the *McDonnell Douglas* burden-shifting framework); *see also Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1242 (9th Cir. 2013) (applying *McDonnell Douglas* framework to FEHA claim on summary judgment).

#### B. Pretext

Clorox does not dispute that Benz has made a prima facie case; that she was terminated at 62 years of age and replaced by someone who was under 40 years of age. Benz does not contest that Clorox has offered a non-discriminatory reason for her firing; that she was not performing adequately in her SIM role. Instead the debate is whether Benz has shown a material issue of fact as to whether Clorox's purported reason is pretext for age discrimination.

10

Benz relies on the following evidence[6]:

- Benz's history of good reviews up until the time Sarma became Director of Shopper Insights in December 2011. Clorox counters that Benz had had "yellow" (bottom 15%) and green-minus scores and identified weaknesses before and after Sarma became Director. Clorox contends that Benz's identified weaknesses in communication and thought leadership were exacerbated when the COE role was eliminated and Benz became the dedicated SIM for Target, General Dollar and Family Dollar in late 2009.

- Some of Benz's reviews during 2011-2012 from peers and internal "clients" were good and showed she was fulfilling the SIM role. Clorox counters with contemporaneous reviews that were mixed to poor.

- Sarma's May 2012 confidential email (sent to Benz's manager one week into Benz's 60 day PIP period), indicates that he and his boss had already determined that Benz was not going to not adequately improve, no matter what the actual "results" were. Oppo. at 6-7. Clorox counters that contemporaneous feedback about Benz during the PIP period showed that the identified problems remained. CLX 0584.

- Benz's replacement (Chen) was friends with Sarma; that Sarma notified Chen of the potential opening of Benz's position; and Chen was interviewed by Clorox managers before Benz was terminated. Clorox responds Chen was first considered for a different job at Clorox (Burt's Bees) and that no promises or offers of employment were made to Chen about Benz's position before the position was open.[7]

Benz's evidence does not create a material issue of fact on whether Clorox's justification for her termination was pretext for age discrimination. In order to meet her burden to defeat summary judgment, Benz must introduce direct or circumstantial evidence to show pretext. There is no direct evidence, *e.g.,* statements made to Benz that imply her age was a factor in her termination. There is also no circumstantial evidence "that tends to show that the employer's

---

[6] This evidence is also relied on to support Benz's breach of implied contract claim discussed below.

[7] Benz contends that Rajakanthan Rajaratnam (Sarma's boss) testified that "of the 62 people hired in the last five years in the Global Insights Division of Clorox, none were over 60, one was 56, about 30 were in their 30s and the balance, presumably in the 20s and 40s." Oppo. at 22:4-7. Rajaratnam did not say what Benz claims he did. Instead, he testified that he didn't know the ages of the 62 people hired into the division in the past 5 years. He believed there had "been some over 50"; he reached out to and hired someone who was around 56 years old; he expected that folks hired at the entry level will be less experienced; about half of the 62 people hired were hired in at grade 27 or above; that for the people hired at grade 27 "there would be a curve" and some would be in their 30s and 40s and "possibly some in their 50s" because "there's a couple of people who come to mind." Rajaratnam Depo. at 22-26. On its face, Rajaratnam's testimony is based on an assumption and is not specific--it lacks foundation. It does not create a material issue of fact on Benz's age discrimination claim.

11

1    proffered motives were not the actual motives because they are inconsistent or otherwise not

2    believable." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).

3          Benz argues that the "recap" of performance feedback that House forwarded to Bolding

4    explaining the bases for Benz's termination were "distortions" and "false characterizations,"

5    Oppo. at 10-11 at fn. 13, but it is Benz who mischaracterizes them.  The weaknesses that Clorox

6    identified that led to her termination included communication weaknesses in client presentations;

7    lack of thought leadership; failure to drive business (measured by increased sales on her projects,

8    not increased partnerships or research opportunities); and failure to perform on the same level as

9    her peers.  *See* CLX 0001- CLX 0005.  Many of these weaknesses were identified in 2007,

10   intermittently through 2008-2010, and consistently in 2011, especially after Benz assumed the

11   position as dedicated SIM for Target, General Dollar and Family Dollar and *prior* to Mr. Sarma's

12   arrival in December 2011.  *See, e.g.,* Warren Decl. ¶¶ 4, 5,7; Ex. 17 to Bolding Depo., 2008 PMP

13   (yellow on Leadership & Influence); 2009 PMP (yellow on Communication; ); 2010 PMP (green-

14   minus on Communication and Leadership & Influence, "she still needs to get to the point faster

15   and more clearly to keep her audience with her"); 2011 PMP (green-minus on Communication and

16   Leadership & Influence; advised to drive "greater impact" improve leadership and rated "medium"

17   for her performance on her P2 grid); *see also* Hoffstedder Depo. at 164:21-165:15, 183:6-184:21

18   (Benz's supervisor until January 2012 "not surprised" that Benz was placed on action plan because

19   Benz failed to improve on areas identified in November 2011 and Benz was not meeting

20   expectations in her current role).[8]

21         Benz argues that some of her co-workers thought her work was beneficial in 2011 and

22   2012.  *See* Benz Decl., ¶¶ 35, 37, 46, 47; CLX 0545 (360 feedback from Stephanie Cunningham

23   rating Benz high on thought leadership and communication, but lower on business acumen and

24   decision making, commenting that Benz is "truly one of the best minds at Clorox," who has not

---

[8] Benz notes that instances of her communications, business acumen and thought leadership skills were recognized as adequate and improving at various points in 2010 and 2011.  *See* Oppo. at 16-17 & fns. 18-20.  However, instances of adequacy or improvement do not undermine the consistent identification of these areas as weaknesses and the eventual determination that she was not achieving the required performance given her level and role in the organization.

received the "full recognition" that she deserves). But others responsible for the Target and General Dollar chains found it deficient. Monson Decl. ¶¶ 8-11 & Exs. A &C; Mizerny Decl. ¶¶ 5-9, Exs. A&B; Warren Decl. ¶¶ 4, 5, 7, Exs. A&B.[9] Benz does not dispute that the failure to drive business and perform at the same level as her peers were motivating factors for her termination. *See, e.g.*, CLX 0584 (identifying awards and achievements of Benz's peers). Benz does not address or point to evidence showing that in late 2011 and 2012 Benz was performing on the same level as her peers.[10] Benz has failed to point to evidence showing that Clorox's motives were either inconsistent or unbelievable.

Finally, even taking all evidentiary inferences in the light most favorable to her – that Sarma wanted Benz to fail in her PIP; that Sarma had made up his mind to terminate Benz despite her efforts to improve; and that Sarma wanted to hire his friend Chen into the position – Benz still fails to create a material fact that age discrimination was the but for cause or a substantial factor in her termination because of the evidence from co-workers and *other* supervisors that Benz was *not* fulfilling her SIM duties for Target, General Dollar and Family Dollar and that she was not performing on the same level as her peer grade 27s (in the PMP process, in the 360 feedback reviews, or on the P2 grids). *Cf. Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 344 (Cal. App. 2008) (an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). The supposed evidence of pretext does not address the unrebutted deficiencies identified in Benz's performance and is not sufficient to survive summary judgment.

---

[9] As noted above Benz ascribes the poor reviews from Monson and Mizerny as due to personality conflicts that she was attempting to manage. Benz Decl. ¶¶ 19-20. However, Benz does not explain how Warren's declaration, identifying weaknesses in 2007 (which she "improved on") that continued in 2011 and 2013, is inconsistent or otherwise suggests pretext. Warren Decl. ¶¶ 4, 5, 7.
[10] Instead, Benz argues that calibration and comparisons between her and her peers are irrelevant to the PIP process, which should have focused only on her own performance. *See* Oppo. at 8:13-14. Benz also points to Focal Reviews produced by Clorox that show that various employees had one or more key opportunities for improvement "like plaintiff." Oppo. at 20-21, fn.25 (citing CLX 0903-933). Benz points to no review in particular and does not provide an analysis to show how these Focal Reviews support an inference of pretext or otherwise undermine Clorox's reasons for terminating Benz.

## II. IMPLIED IN FACT CONTRACT AND GOOD CAUSE TERMINATION

Benz argues that Clorox's personnel policies and guidelines for managing employee performance created an implied-in-fact contract to terminate only for good cause. Under California law, courts must look to the "employer's policies, practices, and communications in order to" determine whether an implied-in-fact contract exists. *Scott v. Pacific Gas & Electric Co.*, 11 Cal. 4th 454, 463 (1995). Factors courts must consider are an employee's reasonable reliance on an employer's policies and manuals, actions and communications from the employer reflecting assurances of continued employment, longevity of service, and industry practice. *Id.* In conducting this analysis, courts must "apply ordinary rules of contract interpretation to determine whether these disciplinary procedures have become implied terms of the employment contract." *Id.* at 470. The Ninth Circuit, applying California law, has recognized that the existence of an implied-in-fact employment contract is a question of fact for the jury. *Kern v. Levolor Lorentzen, Inc.*, 899 F.2d 772, 776 (9th Cir. 1990). However, where "the undisputed facts negate the existence or the breach of the contract claimed, summary judgment is proper." *Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 337 (2000).

Benz relies on the following Clorox documents to support her implied-in-fact theory:

- <u>Clorox Company Corporate Policy "Manage Performance."</u>  Guidelines "for the performance improvement process used to manage unsatisfactory performance." CLX 0048, Declaration of Dennis John Woodruff, at Ex. 2. The policy goal of the performance improvement process is to notify employees and "formally give the employee a reasonable period of time to improve the performance." *Id.* Under the Policy, an employee with "substantial" performance issues is given the option of a "Performance Improvement Plan" (PIP) or a "Work-out Plan." Under the PIP, employees are given a specific timeframe to improve performance. *Id.* at CLX 0049. The employee must demonstrate sustained improvement "or the employment will be terminated." If an employee successfully completes the PIP, "any future failure to perform satisfactorily may result in additional disciplinary action up to and including termination." *Id.* Under the Work-out Plan option, the employee must resign within 60 days but will work at 60% capacity during that time and receive full pay and benefits. *Id.* Under the Work-out Plan, Clorox "may terminate the employee's employment at any time in the event of the employee's misconduct, dishonesty, neglect of duty, insubordination, or any other violation of Clorox policies." *Id.* at CLX 0050.

- <u>Clorox Company Policy HR-036</u>. "Equal Opportunity: Ethics and Standard," affirming Clorox's commitment to employment decisions based on individual merit. Compliance

14

with this policy and its procedures are "mandatory." *Id*. at CLX 0045.[11]

Clorox disputes that these documents create an implied-in-fact contract and relies on language in the application for employment signed by Benz that: "if employed, employment and compensation can be terminated, with or without cause, and with or without notice, at any time, at the option of either" Clorox or Benz. PL 007, Ex. 1 to Woodruff Decl. However, at will language in employment application that is *not* integrated into an employment contract does not necessarily preclude the existence of an implied-in-fact contract. *See e.g.*, *Harden v. Maybelline Sales Corp*., 230 Cal. App. 3d 1550, 1556 (Cal. App. 1991) ("at-will clause contained in defendants' standardized, preprinted employment application is merely evidence concerning the ultimate agreement entered into between the parties. Not being an integrated agreement, the parol evidence doctrine does not preclude consideration of contemporaneous oral agreements."); *McLain v. Great Am. Ins. Cos*., 208 Cal. App. 3d 1476, 1485 (Cal. App. 1989); *see also Reid v. Smithkline Beecham Corp*., 366 F. Supp. 2d 989, 994, 2005 U.S. Dist. LEXIS 11188, 9 (S.D. Cal. 2005) ("at-will provision in Plaintiff's employment application does not preclude her from introducing proof of an implied contrary understanding.").

Here the application explicitly states that use of the application form does not indicate there are any positions available, does not indicate what if any position the applicant would be hired for, or discuss compensation or terms of employment. There is no evidence that the application became an employment contract, much less an integrated contract that would bind Benz and Clorox to the at-will language and prohibit introduction of evidence of an implied-in-fact contract to dismiss only for good cause.[12]

The at-will language in the application, however, is still relevant to determine whether an

---

[11] Benz also argues that the Clorox EEO Policy sets forth Clorox's commitment "to employment decisions based on individual merit" is a "mandatory" policy. Oppo. Br. at 6. However, the EEO Policy makes it clear that the "mandatory" language applies only to compliance with Clorox's EEO policies, which are not at issue here. CLX 0045-47.

[12] Clorox argues the Court should follow *Garcia v. Lucent Techs*., 51 Fed. Appx. 703, 704, 2002 U.S. App. LEXIS 24158, 3 (9th Cir. Cal. 2002), where the Court found that two express writings with at-will language – an application for employment and a subsequent employment appraisal – precluded a contrary implied understanding. The Court will not rely on an unpublished Ninth Circuit decision that is contrary to published California Court of Appeal decisions addressing California law. *Garcia* is also readily distinguishable, as the Court did not analyze whether there was an integrated employment contract.

1  implied-in-fact contract otherwise exists. *Guz v. Bechtel National, Inc*., 24 Cal. 4th 317, 340
2  (2000) (finding that an at-will provision in employer handbook may not be conclusive, but it
3  cannot be "be ignored in determining whether the parties' conduct was intended, and reasonably
4  understood, to create binding limits on an employer's statutory right to terminate the relationship
5  at will."). Benz claims the implied-in-fact contract evidence in this case is sufficient to survive
6  summary judgment and get the issue to a jury, similar to *Guz v. Bechtel National, Inc*., 24 Cal. 4th
7  317, *Scott v. Pacific Gas & Electric Co*., 11 Cal. 4th 454 (1995), *Foley v. Interactive Data Corp*.,
8  47 Cal. 3d 654 (1988) and *Kern v. Levolor Lorentzen, Inc*., 899 F.2d 772 (9th Cir. 1990).

9        In *Guz*, the California Supreme Court considered an employee's claim that he could not be
10 discharged absent good cause because of the existence of an implied-in-fact contract. The Court
11 rejected the plaintiff's claim that his long service, positive employee reviews, and promotions (the
12 "merit of his career") were sufficient to overcome the presumption of at-will status. *Guz*, 24 Cal.
13 4th at 341-42 ("an employee's mere passage of time in the employer's service, even where marked
14 with tangible indicia that the employer approves the employee's work, cannot alone form an
15 implied-in-fact contract that the employee is no longer at will."). Instead, the question is whether
16 the *employer's* conduct – through its written and unwritten policies and practices, or assurances
17 made to employees – created a specific, reasonable understanding that employees would not be
18 terminated but for cause. *Id*. at 342. As such, the California Supreme Court, remanded to allow
19 the determination of whether defendant created an implied contract through its "written personnel
20 provisions covering termination from employment" and "RIF Guidelines" providing "fair layoff
21 protections" to its employees. *Id*. at 345-46, 348.

22       Here, the "Manage Performance" policy, unlike the policies at issue in *Guz*, does not
23 address "termination" or "reductions in force," but instead addresses managing employee
24 performance. Benz points to no words in the Policy that, when read in the light most favorable to
25 her, creates an implication that termination will be governed by the Policy or implies that the
26 Policy is mandatory and employees will not be terminated absent cause without first exhausting

27
28

the Policy.[13]

In *Scott*, the undisputed evidence was that defendant's policies detailed exactly when termination (or demotion) could occur.[14] The California Supreme Court concluded that there "was ample evidence from PG&E's personnel policy manual, and the testimony of one of PG&E's own human resources managers, to support the view that PG&E employees had a reasonable expectation that the company would follow its own human resources policy, which had as its basic premise the disciplining of its employees only for good cause." *Id*. at 465.

Here, however, the Policy relied on by Benz does not provide or imply – as in *Scott* – that demotion or termination will occur *only* after the Policy has been followed. Instead, the aim of the Clorox "Manage Performance" Policy – on its face – is to have the employees work with their managers to "manage" and improve performance. At oral argument, Clorox contended that there is no evidence that Clorox always followed the "Manage Performance" Policy before firing an employee (without cause), and Benz points to no such evidence.[15] Similarly, Benz cannot identify any language in the Policy itself providing or suggesting that the company must implement the Policy prior to terminating an under-performing employee.[16] At most the purpose of the Policy is to give employees "a reasonable period of time" to improve performance. A PIP (if selected

---

[13] As discussed below, there is likewise no evidence in the record from Clorox employees that application and exhaustion of the Policy were required before an employee could be terminated for under-performance.

[14] In *Scott*, the policies provided that: "Termination occurs when 'Positive Discipline has failed to bring about a positive change in an employee's behavior.' Termination may also occur immediately 'in those few instances when a single offense of such major consequence is committed that the employee forfeits his/her right to the Positive Discipline process,' such as theft or striking a member of the public." *Scott*, 11 Cal. 4th at 461.

[15] In an attempt to argue that the Policy is mandatory at Clorox, Benz relies on the deposition testimony of Paul Hollis and contends that Hollis testified as follows: if an employee fails an action plan "the employee is not just fired, but placed on a PIP, according to the process that HR presents." Oppo. at 10. Hollis's actual testimony does not support Benz. Hollis testified about *one case* where he supervised an employee on an action plan. In that case he followed the process given to him by HR and placed the employee on the PIP after the action plan failed. Hollis did *not* understand that Clorox's policies prevented him or Clorox from firing an employee at the end of an unsuccessful action plan. Hollis did not testify that placing an employee on a PIP was mandatory at Clorox. Hollis Depo. at 89:25 – 90:25.

[16] Benz points to language in Clorox's "Equal Opportunity: Ethics and Standard" Policy that makes Clorox's EEO policies mandatory. *See, e.g*., Oppo. Br. at 4, 6. However, compliance with Clorox's EEO policies – such as cooperating with internal investigations on discrimination complaints – are not at issue here. At issue is Clorox's practice with respect to its "Manage Performance" Policy.

1  instead of the Work-out option) provides that "sustained improvement" must be demonstrated or
2  "or the employment will be terminated," and any future failure to perform "may result in
3  additional disciplinary action up to and including termination." CLX 0049. Further, if the 60-day
4  Work-out option is selected, the Policy provides that Clorox may nonetheless terminate for cause
5  "at any time." CLX 0050; *see also* Bolding Deposition at 302 (language at end of Policy confirms
6  that even though an employee chooses the Work-out plan, they can still be terminated for cause at
7  any time).[17]

In *Foley*, the California Supreme Court reemphasized that the at-will presumption under California law could be overcome by a showing of an implied-in-fact contract to terminate only for cause. The Court remanded so the trier of fact could determine whether or not plaintiff's evidence – including repeated oral assurances of job security and written "Termination Guidelines" which implied "self-imposed limitations on the employer's power to discharge at will" – were sufficient to demonstrate an implied-in-fact contract of for cause termination. 47 Cal. 3d at 681-82. Here, Benz points to no oral assurances or guidelines for "termination" that could have bound Clorox.

Finally, in *Kern*, the Ninth Circuit found that, "[a]lthough the evidence of an employment contract was not overwhelming, it was adequate to allow the issue to go to the jury. There was evidence that Levolor had a policy of laying off 'AAA' employees last; that Kern was 'AAA' rated; that Levolor had a policy of rating each employee before deciding on layoffs; and that Kern was not given a rating." 899 F.2d at 776. Here, as noted, there is no evidence that the "Manage Performance" Policy was mandatory prior to termination, either by its own terms or through testimony of Clorox employees. Similarly, Benz has no evidence showing that Clorox has a

---

[17] Benz asserts Bolding testified that "the only grounds upon which termination may occur, at any time, without the opportunity to show improvement under a PIP" are the cause reasons contained in the Manage Performance Policy. *See* Oppo. at 3-4 & fn.4 (citing Bolding testimony at 56:17-25); *see also* CLX 0050. That is incorrect. At page 56 of her deposition transcript, Bolding testified that *Benz* was not terminated for any of the "cause" reasons listed in the Manage Performance Policy. Bolding Depo. at 56:17-25. At page 302 of her deposition testimony, Bolding states that the "cause" justifications included at the end of the Manage Performance Policy under the Work-out option heading simply make clear that termination for cause can occur despite an employee being on a Work-out agreement. *Id.* at 302:5-21.

18

policy of terminating employees only after placing them on a PIP.

Benz proffers no evidence other than the "Manage Performance" Policy to show she had an implied-in-fact contract that required good cause termination.[18] As opposed to the cases she relies on, there is no evidence that the "Manage Performance" Policy was mandatory or that compliance with the Policy was a prerequisite to termination absent cause.[19] Benz has not pointed to any oral assurances made by Clorox regarding her job security. On the other hand, the at-will provision in the employment application she signed, while not conclusive, is evidence that Clorox did not intend to alter California's presumption of at-will employment. *Cf. Eisenberg v. Alameda Newspapers, Inc*., 74 Cal. App. 4th 1359, 1390 ("Because [plaintiff's] conclusory assertions fail to provide the factual evidence necessary to overcome the presumption of at-will employment, they are insufficient as a matter of law either to controvert that presumption, or to support a cause of action for breach of implied-in-fact contract."). Construing the evidence in the light most favorable to her, Benz fails to identify any evidence to create a material issue of fact supporting her argument that the Manage Performance Policy created an implied-in-fact contract not to terminate her absent her failure on the PIP.[20]

---

[18] I note that Benz does not argue that the PIP document itself created an express contract not to discharge but for failure to improve or for cause. Nor does plaintiff argue that the PIP document otherwise supports her implied-in-fact argument. CLX 0027-28. Even if she did, those arguments would fail because: (i) Benz admits that she did not sign the PIP document; and (ii) the language of the PIP document (including the section confirming that employees on the Work-out option may nonetheless still be terminated for cause) is materially similar to the language of the "Manage Performance" Policy.

[19] *Pugh v. See's Candies, Inc*., 116 Cal. App. 3d 311, 329 (Cal. App. 1981), also relied on by Benz, is also inapposite. In *Pugh*, the Court of Appeal found facts in the record from which a jury could determine the existence of an implied promise of for cause termination. Those facts included "the duration of appellant's employment, the commendations and promotions he received, the apparent lack of any direct criticism of his work, the assurances he was given, and the employer's acknowledged policies." Here, there were no assurances of continued employment, no promotions (after she reached grade 27), the record shows consistent identification of areas where Benz needed to improve, and there is no mandatory language in the Manage Performance Policy.

[20] Because there is no merit to Benz's implied in fact claim, I need not address Benz's argument that Clorox violated the good cause standard because she was not fully afforded the opportunity to improve under Clorox's Manage Performance Policy, whose goal is to give employees on a PIP "time to demonstrate improved performance." CLX 0048.

## CONCLUSION

For the foregoing reasons, summary judgment is GRANTED to defendant.[21]

**IT IS SO ORDERED**.

Dated: April 7, 2014



WILLIAM H. ORRICK
United States District Judge

---

[21] Plaintiff's administrative motion to file under seal, Docket No. 56, which is narrowly tailored and seeks to seal only third-party personnel information is GRANTED.